**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CURTIS MILLER and EARNEST THOMAS,**        ) <br>       **Plaintiffs,**   ) <br>   ) <br> **v.**   ) <br>   ) <br> **THE UNIVERSITY OF CHICAGO,**   ) <br>   ) <br>     **Defendant.**   ) | **No. 05-CV-01663** <br><br> **HONORABLE DAVID H. COAR** |

**MEMORANDUM OPINION AND ORDER**

Before this Court are two motions for summary judgment filed by Defendant the University of Chicago ("the University" or "Defendant") against Curtis Miller ("Miller") and Earnest Thomas ("Thomas") (collectively "Plaintiffs") pursuant to Federal Rule of Civil Procedure 56. Plaintiffs have complained that the University discriminated against them on the basis of race and age in violation of their rights under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. Sec. 621 et seq., and that the University violated the Fair Labor Standards Act, 29 U.S.C. §207, 29 C.F.R. 541.118 ("FLSA"). For the reasons set forth below, Defendant's motions are GRANTED.

# BACKGROUND[1]

## *Miller Facts*

Curtis Miller is an African-American male who worked as a full-time employee in the University's Department of Physical Education & Athletics ("the Department") prior to his termination in April, 2004. Facts ¶ 2. Miller was first hired in 1985 as the Assistant to the Director of Facilities, under Brian Baldea ("Baldea") who was the Director of Facilities at the time. Facts ¶ 22. At all times relevant to the instant case,[2] Tom Weingartner ("Weingartner") was the Director of Athletics, and had ultimate supervisory authority over Department employees. Id. ¶¶ 16, 22. The University believed that Miller was exempt from the requirements of FLSA. Facts ¶ 24.

In 2003, the department was reorganized in conjunction with the construction of the new Gerald Ratner Athletics Center ("Ratner Center"). *See id.* ¶ 12. As part of this reorganization, Weingartner created a new full-time position called the Assistant Director of Athletics for Facilities Management ("ADAFM") and hired Jennifer Coleman ("Coleman") to fill it. *Id.* ¶¶ 13-14. Miller soon after became Facilities Manager/Facilities Services – one of three newly created Facilities Manager positions – which involved little substantive change of duties but meant that Miller now reported to Coleman in her role as ADAFM. *Id.* ¶ 50. At this point, Miller reported directly to Coleman, who was in charge of "all facilities responsibilities," but she

---

[1]Defendant has moved to strike Plaintiffs' Response to Facts. In general, there is merit to Defendant's arguments. However, this Court does not find it necessary to strike the objections and statements in their entirety, and will instead incorporate these challenges into its interpretation of the facts when ruling on the summary judgment motion.

[2]That is, from 2003 onward. All contested employment actions occurred following the reorganization of the Department that took place in 2003.

in turn reported to Weingartner, who retained ultimate authority to make "all hiring, firing, and major purchasing decisions in the Department." *Id.* ¶ 16. Also in conjunction with this reorganization, Weingartner initiated an effort to "raise the level of performance expectations within the department." *Id.* ¶ 15; *see also id.* ¶ 66.

Miller himself was responsible for coordinating the physical setup of all the various activities that took place within the Department, physical education classes, intercollegiate contests, practices, and club sport, and in addition was in charge of "making sure that all of the varsity competitions transpired." *Id.* ¶ 26. Other employees, titled "athletic aides," were generally responsible for the physical labor required to complete these tasks. *Id.* All of these aides belonged to Local 73 of the Service Employee International Union division of the AFL-CIO ("SEIU"). *Id.* ¶ 27. The aides worked under a labor agreement requiring that their supervisors be non-union University management workers and limiting the extent to which supervisors could perform aides' normal duties. *Id.* Miller once exceeded these manual labor limitations and subjected the University to a grievance. *Id.* Select tasks in the Department, such as custodial services and the maintenance of scoreboards and exercise equipment, were performed by outside vendors. *Id.* ¶ 7.

Certain aspects of Miller's work were administrative or executive in nature. With respect to the athletic aides, Miller would generally: verify the aides' timesheets; review their work at the end of the day; determine the division of work shifts; prepare annual performance evaluations of the aides; and perform these tasks using a personal workspace and email account that others were not given. He was generally viewed as the supervisor of the athletic aides, according to: at least one of the aides themselves, *id.* ¶ 28; Miller's own opinion, *id.* ¶ 44,

Miller's Int. Resp. 7, Tab G at 10, Miller's EEOC Intake Questionnaire at 1-2, Compl. at 2; and the opinions of coaching staff who believed he was the appropriate person to address with concerns about the facilities, *id.* ¶¶ 38, 40. There were limits to Miller's power and independent authority: though he carried out some supervisory responsiblities with respect to the aides, he did not have ultimate authority over employment decisions or performance reviews, *see id.* ¶ 28, 29, and 34; and Miller made some payments from petty cash, but in most instances would only make purchasing suggestions to Weingartner, who was ultimately responsible for those decisions, *id.* ¶ 33. Nonetheless, it is undisputed that "[t]he University expected Miller to exercise independent discretion in carrying out his job duties." *Id.* ¶ 55.

Weingartner received mixed signals regarding Miller's ability to adequately perform the tasks of his position. While Baldea had been Miller's supervisor, he generally gave the Petitioner positive performance reviews. Baldea Aff. ¶¶ 4, 6. However, Weingartner disagreed with these evaluations, and heard from other parties that Miller "was a subject of considerable criticism and controversy."[3] *Id.* ¶ 25. Baldea himself noted some concerns in Miller's performance reviews of 2001 and 2002, *id.* ¶ 42, which state in part: "Concerns exist over the relationship between Mr. Miller and some members of this Department. Mutual cooperation, respect, and smooth functioning have suffered as a result...I feel challenged in the coming year to work with Mr. Miller in finding ways to restore positive motivation in his work. He's a valuable assey with some outstanding capabilities," Baldea Aff. Ex. A. Baldea also once reprimanded

---

[3]Petitioner Miller disputes that he had this reputation in his Response to Facts, but fails to dispute that Weingartner believed it to be the case.

Miller in writing for payroll concerns, discussing poor decionmaking on Plaintiff's part regarding the work hours of one of the athletic aides.  *See generally id.* Ex. C.

When Coleman took over as Miller's supervisor, she, too, noted some problems with Miller's job performance.  She was first warned that "she had inherited a problematic situation with regard to Miller."  *Id.* ¶ 66.  She also questioned several of the University coaches and discovered that they had problems with the way in which Miller and his crew were performing their duties.  *Id.* ¶¶ 70-71.  Coleman herself encountered problems concerning Miller's: availability, *id.* ¶ 76; communicativeness, *id.* ¶ 77; insubordination, *id.* ¶¶ 78, 80-81,86-87; and lateness, *id.* ¶ 79, 88.  There was also significant tension between Coleman and Miller regarding athletic aide evaluations; in one instance, Coleman sought to have criticisms inserted into particular performance reviews and Miller refused on the grounds that he was better able to judge their performance.  *Id.* ¶¶ 89-90.  Such tension was particularly apparent in Thomas's job review in February of 2004, in which performance evaluation revisions went back and forth between the two parties at least six times.  *Id.* ¶ 90.  The problems also became clear in regard to the structuring of overtime pay, which athletic aides saw as important supplemental income, but which depleted Department resources.  *Id.* ¶ 95.  Though Miller denies that he was responsible for coordinating the allocation of overtime, *id.* ¶ 94, he had several conversations with Coleman in which she asked him to reduce these costs, *id.* ¶¶ 95-96, and Miller showed reluctance in making these changes, *id.* ¶ 96.

The problems between Coleman and Miller came to a head in the fall of 2003.  Miller met with Weingartner to discuss some of the above issues, but Weingartner expressed his support for Coleman.  *Id.* ¶ 98.  During a meeting between all three involved parties, intended to

ease tensions in the workplace, Weingartner again voiced his support for Coleman, a response that Miller saw as discriminatory and hostile. *Id.* ¶ 99. On October 24, 2003, Coleman gave Miller a formal performance review that outlined her concerns about his work, and mentioned specific problems and areas in need of improvement. *Id.* ¶ 103; Miller Dep. Ex. 14 (citing a "basic lack of thoroughness and attention to detail in your area of management," questions about the "productivity of your area of responsibility," lack of "a sense of trust and dependability in regards to you and your crew," doubts about "your overall initiative and problem solving ability," and failure to adapt to new job demands). The memorandum also noted that another review would be made in 45 days. *Id.* Coleman did not respond to this review, orally or in writing. *Id.* ¶ 104.

On January 5, 2004, Coleman wrote another formal performance review, reiterating the same work concerns. *Id.* ¶ 107; Miller Dep. Ex. 18. This document also put Miller on probation for 45 days, during which time he was to accomplish 10 specific tasks or risk termination. *Id.* Miller did not respond to this memorandum, orally or in writing. *Id.* With respect to both of these reviews, Miller did not believe that the criticisms were valid, and felt that, if anything, they were simply a pretext for discrimination. *Id.* ¶¶ 104, 108.

After the probationary period had ended, Coleman wrote to Miller to inform him that she would be recommending that his employment be discontinued. *Id.* ¶ 109. Miller was terminated in mid-April, 2004, *id.*, after Weingartner consulted with the University's human resources department and decided to adopt Coleman's recommendation, *id.* ¶¶ 119-121. Miller was replaced by John Carey, a 26 year-old Caucasian who had been working as one of the other Facilities Managers. *Id.* ¶ 122.

There are some indications that race was a problematic issue within the Department. However, these alleged tensions generally did not raise to the level of formal proceedings. At one point, Miller met with the University's Affirmative Action Officer, Aneesah Ali, to discuss such "discrimination issues." *Id.* ¶ 115-117. This never evolved into a formal discrimination grievance. Also, in response to reports that Thomas had made allegations of racism regarding Coleman, Weingartner arranged to sit down with him. *Id.* ¶ 118. However, though Thomas filed a grievance against Coleman for general work demands, he never lodged a formal complaint of discrimination. *Id.* ¶ 119.

<u>*Thomas Facts*</u>

Plaintiff Earnest Thomas is an African-American male who worked as an athletic aide in the Department prior to his termination in June of 2004. *Id.* ¶ 3. On June 28, 2004, he met with the Department's administrator of human resources, Mary Cerceo ("Cerceo"), in order to recover a paycheck that he claimed he was owed. Facts ¶ 125. Immediately after the meeting, Cerceo met with Weingartner and Coleman and told them that Thomas had said "[t]his job has me so stressed out, it's the year 2000 and we're still being treated this way. I guess jail is the next place for me because when I start shooting I ain't gonna stop at one." *Id.* ¶ 126.[4] The substance of the conversation with Thomas was memorialized in a report to campus police and a follow-up email from Cerceo to Weingartner and Coleman. *See id.* ¶ 128. Following a police-supervised meeting with the two administrators later that day, Thomas was suspended. *Id.* ¶¶ 129-30. Though an investigation by campus security failed to find witnesses to the incident, Weingartner

---

[4]Plaintiff disputes that he said this, but does not dispute that it was reported that he did. Pl.'s Resp. to Facts ¶ 126.

chose to rely on Cerceo's words – taking into account the fact that they had been friends prior to the incident – and acted on the recommendation of the human resources director in terminating Thomas. *Id.* ¶¶ 131-32. On June 29, 2004, Coleman wrote Thomas a letter informing him that he was being terminated. *Id.* ¶ 133. The University's Office of General Counsel then sent a letter informing the University community that Thomas was thereafter banned from University property. *Id.* ¶ 134.

On July 7, 2004, SEIU challenged Thomas's termination in a "Step Three" grievance. *Id.* ¶ 135. This initiated a meeting involving all of the key players, at which Thomas's complaints about Coleman's alleged discriminatory actions were introduced, along with co-workers' recollections of the day Thomas threatened Cerceo. Thomas also made several statements that could have been construed as threatening: he asked "if I was gonna do something to either one of you guys, I – I would be stupid to do it out in the open like this, right? Now, if I wanted to hurt, I know where you live, wouldn't that be a better place, to sit across the street, around the corner and watch when you come and then do something to you?"; he told Coleman "if I wanted to do anything to you, I see you all the time," and that he knew where she lived; and, finally, he indicated to Weingartner that he knew where his children "hung out." *Id.* ¶ 138. The University's Employee/Labor Relations Specialist found that Thomas's termination had not violated union rules, *id.* ¶ 139, and, though SEIU gave notice of its intent to file for arbitration, no further action was taken under University or union grievance procedures, *id.* ¶ 140. Thomas was replaced by Asiel Poole, an African American male born in 1984. *Id.* ¶ 141.

## STANDARDS FOR SUMMARY JUDGMENT

A party seeking summary judgment has the burden of showing, through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact that would prevent judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, courts "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Allen v. Cedar Real Estate Group, LLP*, 236 F.3d 374, 380 (7th Cir. 2001).

Even so, the nonmoving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, he must go beyond the pleadings and support his contentions with proper documentary evidence. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In order to successfully oppose a motion for summary judgment, the non-movant must do more than raise a "metaphysical doubt" as to the material facts, *see Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001) (citation and quotation omitted), and instead must present definite, competent evidence to rebut the motion, *see Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001); Fed. R. Civ. P. 56(c). In ruling on a motion for summary judgment, the Court must decide, based on admissible evidence, whether any material dispute of fact exists that requires a trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A non-moving

party who bears the burden of proof on a specific issue must demonstrate by specific factual allegations that there is a genuine issue of material fact in dispute. *McMillian v. Svetanoff*, 878 F.2d 186, 188 (7th Cir. 1989). This evidence provided by the non-movant must be sufficient to enable a reasonable jury to find in his or her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

In ruling on summary judgment regarding discrimination in the workplace claims, "the court should review all of the evidence in the record." *Reeves*, 530 U.S. at 150. In general, a lower court should not substitute its reasoning for that of the fact finder by dividing up the evidence to determine credibility, and will instead leave it to the ultimate fact finder to determine whether the cumulative evidence is sufficient to prove intent to discriminate. *See generally, id.*

## ANALYSIS OF TITLE VII DISCRIMINATION

Title VII prohibits an employer from discriminating on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). There are two ways for a plaintiff to prove a case of discrimination under Title VII – the direct method and the indirect method. A plaintiff proves a case under the direct method by putting forth enough evidence, whether direct or circumstantial, to raise a genuine issue concerning the employer's motivation in carrying out the challenged employment action. *See e.g., Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Neither Plaintiff has argued that he has offered sufficient direct evidence that the adverse employment actions taken resulted from discrimination on the basis of race or age. Instead, each relies on the second method; the indirect, burden-shifting method set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).

Under the burden-shifting method, the plaintiff bears the initial burden of producing evidence to sustain a prima facie case. *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 742 (7th Cir. 1999). Each Plaintiff's prima facie case of race discrimination must show that he is: (1) in a protected class; (2) performing his job satisfactorily; (3) the subject of a materially adverse employment action; and (4) that similarly situated employees outside the protected class were treated more favorably. *Oates v. Discovery Zone*, 116 F.3d 1161, 1171 (7th Cir. 1997).

In terms of the second *McDonnell-Douglass* factor, the prima facie requirement of satisfying employer's reasonable demands is not intended to be onerous. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). However, each Plaintiff must nonetheless advance real proof that he adequately satisfied the demands of the workplace, rather than conclusory assertions regarding his qualifications. *Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1114 (7th Cir. 1998) (finding that the employee's own appraisal of the work they were doing cannot create a genuine issue of fact regarding the accuracy of performance evaluations). Even when employee's self-appraisal contains true statements regarding his or her performance, the employer is still "entitled to determine that the deficiencies in his performance outweighed such accomplishments." *Id.* It is not for this court to determine whether the employer's expectations were the appropriate ones for them to have, or if they had a realistic approach to those expectations; "so long as the employer's employment expectations are in good faith, without fraud or deceit, we only determine if the employee met them." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1090 (7th Cir. 2000).

In order to satisfy the fourth prong of the McDonnell Douglas test for prima facie discrimination, Plaintiff must find a similarly-situated employee. *Rozskowiak*, 415 F.3d 608.

Plaintiff needs to show that similarly-situated employees dealt with the same supervisor, were subject to the same standards, engaged in similar conduct, yet were treated more favorably absent circumstances that would distinguish their conduct or treatment. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). This requires a co-worker who is directly comparable to him in "all material respects." *Burks v. Wisconsin Dep't of Transp.*, 2006 WL 2788439, at *4 (7th Cir. 2006).

Once the plaintiff establishes the prima facie case, the burden then shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for the employment action. *Cowan v. Glenbrook Sec. Servs., Inc.*, 123 F.3d 438, 445 (7th Cir. 1997) (citing *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1115 (7th Cir.1992)). If the employer offers a legitimate, nondiscriminatory reason, the burden then shifts back to the plaintiff to present evidence that the employer's proffered reason is pretextual. *See Bahl v. Royal Indemnity Co.*, 115 F.3d 1283, 1290 (7th Cir. 1997). "This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination" so that Plaintiff "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Rush*, 966 F.2d at 1115 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)).

A Plaintiff may establish pretext by showing that the defendant's stated reasons are factually baseless, did not actually motivate the defendant, or were insufficient to motivate the adverse employment action. *O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th Cir. 2002). "We are not concerned with whether or not the employer's actions were mistaken, ill-considered

or foolish, so long as the employer honestly believed those reasons." *Burks v. Wisconsin Dep't of Transp.*, 2006 WL 2788439, at *6 (7th Cir., Sept. 29, 2006); *see also Nawrot v. CPC Int'l*, 277 F.3d 896 (7th Cir. 2002). In the words of this circuit, pretext consists of "deceit used to cover one's tracks"; *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000) (considering as relevant factors the lack of "statements by the [director], no disparate impact from managerial interventions, nothing except the raw fact that [the director] stepped in").

In order to establish pretext, the Plaintiff must produce evidence suggesting that the employer itself did not believe the proffered reasons for termination. *Id.* (citing *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 397 (7th Cir. 1998)). Plaintiff's subjective determination of the true motivation behind the adverse employment action is an insufficient basis for finding that the employer's explanation is pretextual. *See Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 401 (7th Cir. 1997) ("[I]f the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed") (quoting *Mills v. First Federal Savings & Loan Ass'n*, 83 F.3d 833, 841-42 (7th Cir. 1996)).

Plaintiff must point to specific facts that sufficiently cast doubt on Defendant's proffered reasons for her termination. *See Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 578 (7th Cir. 2003). If Defendant honestly believed the nondiscriminatory reasons it offered, Plaintiff cannot prevail. *See Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 984 (7th Cir. 1999). Furthermore, Plaintiff must present facts "to rebut each and every legitimate, nondiscriminatory reason advanced by the [defendant] in order to survive summary judgment." *Clay v. Holy Cross Hosp.*, 253 F.3d 1000, 1007 (7th Cir. 2001). This court "does not sit as a superpersonnel department

-13-

that reexamines an entity's business decisions, [r]ather, we must determine whether the employer gave an honest explanation of its behavior." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971 (7th Cir. 1999).

At all times the ultimate burden of persuasion rests with the plaintiff to show impermissible motive or intent. *See Kirk v. Fed. Prop. Mgmt. Corp.*, 22 F.3d 135, 138 (7th Cir.1994). Employees lose if the company honestly believed in the nondiscriminatory reasons it offered, even if the reasons are foolish, trivial, or even baseless. *Hartley v. WI Bell Inc.*, 124 F.3d 887 (7th Cir. 1997). A court will rarely second-guess an employer's evaluation of employee credentials. *See Ash v. Tyson Foods, Inc.*, 126 S.Ct. 1195 (2006) (demanding that allegedly superior credentials must "jump off the page and slap you in the face"); *Millbrook v. IBP, Inc.*, 280 F.3d 1169 (7th Cir. 2002) (finding in a refusal to hire case that "evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no disute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue") (citation omitted).

### *Miller's Discrimination Claim*

Defendant has not challenged Miller's claim that he is a member of protected classes based on his age and race, nor has it contested that he suffered an adverse employment action in being terminated. In order to successfully establish a prima facie case of discrimination under *McDonnell-Douglass*, Plaintiff must still show that: (1) he was meeting his employer's legitimate expectations; and (2) other similarly-situated employees who were not members of the class were treated more favorably. *See Oates*, 116 F.3d at 1171. In addition, Miller must provide

some grounds on which a reasonable jury could find that the University's stated reasons for terminating him were pretextual. *Cowan,* 123 F.3d at 445. Plaintiff Miller's case fails on all of these counts.

A great deal of Miller's argument that he was meeting his employer's legitimate workplace expectations has no bearing on the only relevant analysis for present purposes – the state of mind of the superiors who made the termination decision, at the time they made the decision, in light of their expectations at the time. Miller relies a great deal on a former supervisor, Baldea, who appears to have given him positive reviews. As Plaintiff states, "the record is replete with undisputed evidence that Miller performed exceptionally well before Jennifer Coleman." Pl.'s Resp. to Summ J. at 3. However, even if true this is essentially irrelevant. First, the impressions of a former supervisor at another time have little to no bearing on the job performance witnessed by the relevant supervisor, Coleman, or her superior, Weingartner, who together decided to terminate his employment. Second, even if glowing reviews in the past are considered, those Miller cites to here are hopelessly out of date – reviews from 1993 and 1995 have very little weight on his performance in 2005. *See Fortier*, 161 F.3d at 1113 ("[E]arlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken."); *see also Cengr v. Fusibond Piping Sys., Inc.*, 135 F.3d 445, 452-453 (7th Cir. 1998) ("[P]ast raises and bonuses do not prove that [plaintiff] was meeting [employer's] legitimate expectations at the time of his discharge."). Finally, it is undisputed that the work environment within the Department changed around the time of Coleman's arrival, and that the employer's reasonable expectations therefore also changed. The question now before this court is whether Miller adequately met the demands of

his position as it stood at the time of his termination, and there is a great deal of evidence that this was not the case.

The record makes clear that Miller was not performing up to expectations. Twice, Coleman gave Miller performance evaluations that outlined her concerns about his general inability to accomplish his work responsibilities in an adequate manner. On October 24, 2003, in correspondence Miller acknowledged having read, she stated:

> After five months, from my observations and interactions directly with you and your staff, I believe there is a serious need for improvement in the management of the facilities services function of the facilities area. This has been substantiated by Tom [Weingartner], Brian [Baldea] (my predecessor), personnel throughout our department, and individuals in the university community who interact with our department. Currently, I see an area that is very reactive (versus proactive) to the needs of this department, has instilled little confidence in those that they serve, and is inefficient with time and personnel. It is my goal to change the perception of this area by creating a management style that is the exact opposite – proactive, respected, and efficient with resources. I would prefer to do this as a team where you and I work together to obtain these goals, but unfortunately we have had a difficult time getting onto the same page.

Miller Dep. Ex. 14 at 1, UC 00002. These observations were extensively supported by other testimony and documentary evidence. *See generally* Weingartner Dep., Baldea Dep., Coleman Dep. Miller made no attempt to rebut the assertions made in the letter other than to dismiss them as "contrived and/or made up," Miller Dep. at 125, and as a result did nothing to address the problems that it contained. It therefore comes as no surprise that these problems were reiterated in another letter dated January 5, 2004. This document put Miller on probation for 45 days, during which time he failed to respond in any way to the letter or accomplish the specific tasks that were demanded of him. After the end of this probationary period, Miller's employment was terminated.

Plaintiff has provided very little evidence to counter these documented problems and conflicts in the workplace, and what he has advanced is unavailing. Several of the facts that Miller points to as evidence of his adequate performance grossly misrepresent, or are selectively quoted from, the record. *Compare, e.g.,* Pl.'s Resp. to Facts ¶ 194[b] ("Miller received a merit increase in June 27, 2003 for his 'outstanding performance.'") *with* Letter from Weingartner, Pl.'s Resp. to Facts Ex. 2 (stating that the Department would be raising his annual salary by the standard merit increase of 2% under Department guidelines, but distinguishing that raise from "merit increases exceeding those guidelines" which are "provided to faculty and staff based on outstanding performance considerations and the finite compensation budget available for allocation"). In addition, he has attempted to get around the numerous contradictions between his version of events and that which is established in the record by twisting his own words in previous filings and flatly contradicting clear evidence in the record. *Compare, e.g.,* Pl.'s Resp. to Facts ¶ ("Miller did not have responsiblitity to make sure the facilities for sporting events complied with the NCAA and other standards.") *with* Miller Dep. at 125-26 ("I had game management responsibilities under the direction of my supervisors...varsity game management is a component within itself. So I had responsibilities within that. Game management is a part of what I was assigned to do [which involved] [m]aking sure that all of the varsity competitions transpired."); and "Reasons for Salary Upgrade," Miller Dep. Ex. 43 (in which Miller claims responsibility for "game preparation and management" and "the supervision of two full-tme staff members and one part-time staff member during but not limited to more than 100 home varsity contests"). Such self-serving and unsupported refutation of the evidence does not create a triable issue of fact. *See Fortier*, 161 F.3d at 1114. Similarly, Plaintiff's citations to the isolated

opinions of co-workers, subordinates, and even supervisors do not adequately undermine a well-reasoned and factually consistent employment determination that he was not performing adequately.  *See id.* (finding that even if self-appraisal contains true statements regarding job performance, the employer is still "entitled to determine that the deficiencies in his performance outweighed such accomplishments").  Therefore, Plaintiff has failed to establish that he has met his employer's reasonable expectations and has therefore failed to establish a prima facie case for discrimination based on race.

Plaintiff has advanced even less evidence to establish that the proffered reason for his termination – that he was not meeting the demands of his position – was pretextual.  In support of this argument Miller points to the employment record prior to Coleman's arrival that this Court has already deemed irrelevant.  He also blatantly misinterprets or exaggerates the record in arguing that Coleman and Weingartner in fact believed that he was performing well.  *Compare, e.g.,* Miller Summ J. Resp. at 6 ("Jennifer Coleman's October 2003 performance review discussed above reveals that even she thought very highly of Miller's job performance.") *with* Miller Dep. Ex. 14 at 1, UC 00002 ("*[T]here are many areas of your performance I feel need to be improved upon*, and this ultimately is the purpose of this letter.  The following is a list of these areas with examples to illustrate *my dissatisfaction*.") (emphasis added); *also compare* Miller Summ J. Resp. at 6 ("Weingartner wrote a letter singing the Department staff's praises and acknowledged that Miller's performance had something to do with the letter.") *with* Weingartner Dep. Ex. 5 at 1 (generally praising the facilities staff without naming any individuals).  In light of the volume of problems Miller was facing, Miller's final argument in support of pretext – that Weingartner failed to address Miller's complaints about Coleman –

completely fails to call into question the simple fact that he was not accomplishing the required tasks of his position.  In any event, Miller makes no claim that this complaint had anything to do with issues of race rather than general tensions between Miller and Coleman.  Had that been the case, there might be some room for inferring pretext from this failure, but as it stands Plaintiff has advanced no basis for such a finding.

This Court's responsibility is not to interject itself into a dispute between a worker and his superior regarding the nature and quality of his work product.  *See Jackson v. E.J. Brach Corp.*, 176 F.3d 971 (7th Cir. 1999) ("[This court] does not sit as a superpersonnel department that reexamines an entity's business decisions, [r]ather, we must determine whether the employer gave an honest explanation of its behavior.").  There is no reason to see the long-running tension between Miller and his superiors as anything other than bad blood over how the University's athletic department was to be run.  Miller's attestations to the contrary are unavailing as his "subjective determination" carries little weight.  *See Chiaramonte*, 129 F.3d at 401 (7th Cir. 1997).  This Court must simply determine whether or not the stated reasons for what happened are "foolish, trivial, or even baseless."  *Hartley,* 124 F.3d 887.  They are not.  Defendant's motion is GRANTED.

<u>*Thomas' Discrimination Claim*</u>

Thomas claims that his termination in June of 2004, allegedly in response to his threats against Cerceo, represented racial discrimination in violation of Title VII.  Plaintiff denies that he ever made the threats, and that event was fabricated in order to provide an excuse for his supervisors to end his employment in spite of his otherwise blameless employment record. Defendant maintains that the termination was a direct response to Plaintiff's threats and that it

followed university policies, cooperated with the SEIU, and had the assistance of the University HR and security staff in making its determination.

Plaintiff Thomas contests the documentation, or in some cases even the substance of negative job performance indicators, and contends that he in fact was meeting employer expectations. *See generally* Thomas Summ J. Mot. Resp. at 3-4. However, Thomas does not effectively dispute the fact that Weingartner, who was ultimately responsible for the employment decisions in the Department, received such reports and believed them to be true. *See, e.g.,* Facts ¶ 124 (stating that "Weingartner had been told by Coleman about various incidents of insubordinate, intemperate, and threatening language and behavior by Thomas," which is only disputed by Plaintiff to the extent that this was suported by a "documented history of performance problems at the University"). In any event, Defendant has at several points conceded the more general question by saying that Thomas's job performance was not at issue prior to the Cerceo incident, but that his threats to a fellow worker, in and of themselves, placed his performance below expectations. It is this fact that Plaintiff has failed to adequately address in his prima facie case.

Plaintiff's claims that he did not threaten Cerceo are unconvincing. He questions the veracity of the events by advancing his own self-serving attestations to the contrary. However, such comments carry little weight, *see Fortier*, 161 F.3d at 1114, particularly when weighed against the countervailing factors, including: consistently contrary testimony from other parties; administrative proceedings that found no reason to second-guess his termination; and his failure to recover testimony or an affidavit in support of his claim that Cerceo later recanted her accusation. Therefore, Plaintiff has failed to establish that there is a genuine issue of material

fact as to whether Thomas made the threatening comments, and therefore failed to show that he met his employer's expectations.

As for the fourth prong of his prima facie case, Thomas has failed to establish that there were other similarly situated workers who were treated differently. Thomas's only effort to meet this requirement is his statement "Thomas can prove he was treated less favorably than other athletic aides because he was fired, while they were not." Summ. J. Resp. at 4. However, he has not done so, and while it may be unreasonable to expect Plaintiff to find another employee who threatened a co-worker, he has made no effor to provide this court with evidence of someone whose employment survived despite "similar conduct." *Radue*, 219 F.3d at 617-18. Thomas has therefore failed to point to a similarly-situated employee.

Assuming that Plaintiff had presented a prima facie case for discrimination based on race, the case would then be evaluated in light of the Defendant's proffered nondiscriminatory reason for the adverse employment decision and whether or not that reason was merely a pretext. *McDonnell Douglas*, 411 U.S. at 804. Plaintiff has failed to show any evidence on which a reasonable jury could so find. Thomas summarily concludes that "a reasonable jury could conclude either that Defendant fabricated a story about Thomas making threatening statements, or that Defendant did not really believe Thomas made the statements, but saw an opportunity to fire him and use the incident as an excuse." In the absence of evidence that racism impacted Weingartner's workplace decisionmaking, or that the department's employment actions following the Cerceo threat were foolish, trivial, or baseless, *Hartley v. WI Bell Inc.*, 124 F.3d 887 (7th Cir. 1997), Thomas has provided no basis for second-guessing his termination.

Plaintiff claims that Weingartner "did not really believe Thomas made the statements, but saw an opportunity to fire him and use the incident as an excuse." Summ J. Resp. at 5. However, this is nothing but rank speculation, unsupported by anything in the record. Weingartner's termination decision was based on the following undisputed facts: Cerceo told Weingartner that Thomas made the remark; Cerceo confirmed her account of the threat in an email to Weingartner; Weingrtner believed that Thomas had a history of threatening language and behavior; and Weingartner was advised by HR based on the above facts to terminate Thomas's employment. *See* Def.'s Summ. J. Reply at 3. Whether or not he in fact *did* threaten his co-worker in this way is irrelevant to the fact that Weingartner justifiably believed that he had done so based upon these factors. *See Burks*, 2006 WL 2788439, at *6. Whether or not the threat against Cerceo actually took place, Plaintiff has provided no basis on which a reasonable jury could find that Weingartner did not believe that it had.

The only question at this point is "whether the employer gave an honest explanation of its behavior," *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 396 (7th Cir. 1998), and though Thomas has made many allegations about the Department's motives, he has not adduced significant proof to undermine either Weingartner's belief that the Cerceo threat was real, or his proffered justification for terminating Plaintiff based on that threat. Therefore, there are no remaining questions of material fact that must be resolved at trial. Defendant's motion is GRANTED.

## ANALYSIS OF RETALIATION UNDER TITLE VII

Section 2000e-3(a) makes it unlawful for an employer to discriminate against an employee because he or she opposed a practice made unlawful by Title VII, whether or not the

employer's action violates Title VII in the absence of the retaliatory intent.  42 USC 2000e-3(a); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994).  Essentially, Title VII protects an employee from "retaliation for complaining about the types of discrimination it prohibits."  *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000).  "To establish a prima facie case for unlawful retaliation, a plaintiff must prove three elements: (1) []he engaged in statutorily-protected expression; (2) []he suffered an adverse employment action; and (3) there was a causal link between the protected expression and the adverse action."  *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005) (quoting *Krause v. City of La Crosse*, 246 F.3d 995, 1000 (7th Cir. 2001)).  In the absence of direct proof of causality, a plaintiff may succeed indirectly via an adapted form of *McDonnell-Douglas*.  *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002).  This requires proof that plaintiff (1) engaged in statutorily-protected activity; (2) performed his job according to the employer's legitimate expectations; (3) suffered an adverse employment action despite satisfactory job performance; and (4) was treated less favorably than similarly-situated employees who did not engage in statutorily protected activity.  *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524 (7th Cir. 2003) (citing *Stone*, 281 F.3d at 644).

Here, Plaintiffs have proceeded along the indirect route, but have nonetheless failed to provide sufficient evidence on which a reasonable jury might find a retaliatory action under Title VII.  Whether or not either Miller or Thomas have adequately established the other factors, this Court has already determined that neither of them met the employment expectations placed upon them.  Plaintiffs have therefore not met the demands of the prima facie case, so both claims fail.  Defendant's motions are GRANTED.

## ANALYSIS OF DISCRIMINATION UNDER ADEA

Neither Plaintiff provides much evidence to support an age discrimination claim, beyond those allegations made in support of race discrimination that this Court already found presented no triable issue of fact. This Court need only consider two *McDonnell-Douglas* factors of Plaintiffs' claim of age discrimination to know that this age discrimination claim fails as well: whether or not the Plaintiff in question was performing to his employer's legitimate expectations, and whether or not the proffered reason was pretextual. The former question is not impacted by the distinction between race and age – both plaintiffs failed to prove that they met their employer's legitimate business expectations, whatever their status. *See* supra, "Analysis of Title VII Discrimination" Section. Therefore, both prima facie cases fail.

In any event, Plaintiffs have also failed to establish that a finding of pretext is any more likely with respect to age discrimination. In resolving this issue, the Court need only consider those limited age-based facts that might distinguish age discrimination claims from those of race discrimination, and whether they are more successful in establishing pretext in the former than they were in the latter. In Miller's case, he claims that Coleman's discussion of the need for "new blood" in the Department "demonstrates that Coleman wanted to get rid of older athletic aides such as Earnest Thomas and replace them with new, younger, employees." Resp. Summ. J. Mot. at 12. In Thomas's case, he references the "new blood" comment as well, but in addition mentions that on one occassion, "Weingartner remarked that he couldn't believe that Thomas was able to go up the ladder like that at his 'age.'" Summ. J. Resp. at 11. Neither of these comments provides grounds on which a reasonable jury could find that Defendant's proffered reasons for the adverse employment action were pretextual.

The Seventh Circuit has expressly found that comments regarding "new blood" are not by themselves indicative of age disrcimination.  *See Fortier*, 161 F.3d at 1113 ("Standard usage and common sense dictate that...'new blood' means a change.")[5]; *see also Beatty v. Wood*, 204 F.3d 713, 716 (7th Cir. 2000).  In any event, this is but one comment, allegedly made by Coleman, that hardly provides adequate foundation for finding that Weingartner was being deceitful in his role as ultimate decision maker.

As for the only additional age-based action that might form the basis for finding pretext, though the transcript is not completely clear it does not seem to indicate that Thomas himself felt that it was a discriminatory event:

| | |
|---|---|
| Q: | Are there any other examples that you can think of where the university discriminated against you because of your age? |
| Thomas: | No, I guess – no. |
| Q: | Okay. |
| Thomas: | But I can tell you what Jen [Coleman] said, and – and one night one of the shot clocks on the...the new clock went out....So I grab a stepladder and run up the ladder right quick and take some pliers and stuff and sort of...tape the wire back up and come right down, and then soon – just as I get down, the thing went – and then the game were back on. |
| Q: | Mm-hmm. |
| Thomas: | And they couldn't believe that at my age that I went up that ladder like that. they just – they – |
| Q: | Who said that? |

---

[5]In that case, this definition was primarily used to rebut plaintiff's claim that use of the phrase "new blood" provided direct evidence of age discrimination, but this Court will adopt its conclusion regarding the common understanding of the term into our analysis of pretext under *McDonnell-Douglas* as well.

| Thomas: | Tom, the boss.  He come down and told me, Earnest, man you run up that ladder like that, you up that ladder faster than the kids.  And say, and you got the game going. |
| Q: | So he was impressed that you were able – |
| Thomas: | Yeah – |

Thomas Dep. at 269-70.  While Thomas now claims that this serves as an "indication[] that Defendant discriminated against Thomas because of his age," Thomas Summ. J. Resp. at 11, that interpretation strains credulity when the comments themselves seem to be completely lacking in animus.

Much as Plaintiffs have provided no basis upon which a reasonable jury could believe Defendant exhibited pretext for race discrimination, they have also failed to provide a basis for finding pretext for age discrmination.  Defendant's motions are GRANTED.

## ANALYSIS OF HOSTILE ENVIRONMENT CLAIMS

To state a claim for a hostile work environment based on race, a plaintiff must show that: (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was sufficiently severe or pervasive so as to alter the conditions of his employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability. *Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1029 (7th Cir. 2004).

Plaintiff must prove that the work environment was both subjectively and objectively hostile.  *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir.1998).  An objectively hostile environment is one that a reasonable person would find hostile or abusive.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  In determining whether a plaintiff has met this standard, courts must consider the psychological harm to the plaintiff, as well as all other circumstances

such as "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. The actions of coworkers, as opposed to supervisors, may be considered, but require that plaintiff demonstrate employer negligence. *See Wyninger v. New Venture Gear, Inc*., 361 F.3d 965, 976 (7th Cir. 2004) (requiring that supervisors "knew or should have known" about the harassment and failed to take reasonable steps to remedy it) (citing *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir.2001)). "[R]elatively isolated instances of nonsevere misconduct will not support a claim of a hostile environment. *Ngeunjuntr v. Metropolitan Life Ins. Co.*, 146 F.3d 464 (7th Cir. 1998) (citing *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526 (7th Cir. 1993).

Plaintiffs have provided nothing but rank speculation and unsupported assertions in support of this claim. Neither Miller nor Thomas have established that the alleged discriminatory actions were "severe or pervasive" as required by the third prong. *Williams*, 361 F.3d at 1029 Under the second prong, they have also failed to establish that the workplace actions were "based on a protected characteristic." *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002); *see also Locke v. Ameritech*, 389 F.3d 708, 713 (7th Cir. 2004) ("The conduct at issue must have a racial character or purpose."). Even when viewed in the light most favorable to the Plaintiffs, Thomas and Miller have failed to adduce to support finding a hostile environment, much less one infused with discriminatory animus.

Miller has provided little evidence upon which a reasonable jury might find that he suffered a racially hostile work environment, and that which he has provided is completely unsupported or effectively countered by Defendant. Miller testified to several instances of

alleged discriminatory behavior, including moments when Coleman: acted in a disrespectful manner; refused to let Miller and other African-Americans use a meeting room to eat; prevented Thomas from entering the Ratner Center for water; denied entry to a group of touring African-American high school students; and, in what seems to be the most significant matter, spotted a rambunctious child wearing an Allen Iverson jersey and allegedly commenting "if you let the kid wear that kind of jersey and you want him to be like that kind of person, then what do you expect?" Miller Dep. at 228-29. Nearly all of these allegations have been effectively rebutted by the Defendant without counter-argument from the Plaintiff. Summ. J. Reply at 8-10 (explaining, for example, that the high school students visited in June 2005, long after Miller's termination).

There was arguably disrespect, or even outright tension, between Miller and Coleman. However, based on an objective standard the cited actions and events, even if construed in Plaintiff's favor, do not amount to an environment that "a reasonable person would find hostile or abusive." *Harris*, 510 U.S. at 21. Miller attempts to bolster this claim by citing to co-worker affidavits that vaguely attribute discriminatory intent to Coleman's motivations. *See, e.g.,* Davila Aff. ¶ ("Jennifer Coleman lost her temper with Curtis Miller, Earnest Thomas, and other minority employees on a regular basis. I never saw Jennifer Coleman lose her temper with a white employee."). However, these affidavits carry little weight in light of the fact that they make conclusory statements and unsupported speculations about the University's motivations. *See Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655 (7th Cir. 1991) ("Discrimination law would be unmanageable if disgruntled employees-the friends of the plaintiff and often people in the same legal position as the plaintiff-could defeat summary judgment by affidavits speculating about the defendant's motives."). These affidavits also cite actions in support of their claims

with which Miller was not involved, or only vaguely address those issues and events about which Miller took notice in his own filings.  Lastly, as a procedural matter, these affidavits were submitted at the end of discovery and were not disclosed as they should have been under Fed R. Civ. P. 26(a)(1)(A), preventing Defendant from effectively executing discovery on the issues they raised.

In any event, Plaintiff Miller has provided no evidence that these actions and events were driven by discriminatory animus as required by the second prong of the prima facie case under *William*.  The *only* unexplained action arguably connected to race was Coleman's comments on an Allen Iverson jersey.  However, this does not establish discriminatory intent on its face, as there is no reason to think that it was an attack on African-Americans generally rather than Allen Iverson specifically.  In any event, this comment was in no way tied to the motivating factors behind the other allegedly hostile workplace actions.  There is therefore insufficient evidence to establish that the alleged harassment was "based on race," *Williams*, 361 F.3d at 1029, and Miller's claim based on hostile work environment fails.

Thomas fares no better.  His hostile environment claim is predicated on Coleman's: "generally hostile and abusive manner"; alleged refusal to let an African-American athletic team into a building; failure to provide Thomas with keys to Ratner; failure to allow workers into Ratner for water; confrontation with Thomas regarding picking up pieces of paper led to physical aggression; and her requirement that Thomas remove tin stakes without the proper tool.  Thomas Summ J. Resp. at 6-8.  In addition, this Plaintiff maintains that Baldea had once said that he couldn't "stand those people" in references to "black peoples" and that he "hated" the whole

race. *Id.* at 8. Finally, Miller maintains that someone had written "kill niggers. All niggers need to die," on a wall in the Department. *Id*.

The asserted events do not give rise to an objectively abusive work environment. Coleman's conduct was repeatedly referred to as disrespectful, Facts Reply ¶¶ 163-65, but this does not provide adequate grounds for a Title VII claim. *See Patton v. Indianapolis Public School Bd.*, 276 F.3d 334 (7th Cir. 2002) (finding that rude or boorish behavior is not "so severe or pervasive as to alter the conditions of her employment in a significant way"). The work-related events were adequately explained by Defendant and these explanations were not rebutted by Plaintiff. Thomas Summ. J. Reply at 7-10. The only remaining events do not adequately amount to a generally hostile environment. Baldea's single instance of discriminatory language cannot be imputed to the Department as a whole, particularly being remote in time and isolated in its occurrence, and the racist graffiti was by no account perpetrated by Department staff.

Thomas has similarly failed to establish that these allegedly hostile actions are based on his status as an African-American. Only a few interactions with his superiors could possibly be classified as actions "based on race," and those have been adequately explained by the Defendant. First, the fact that one African-American sports team was denied admission is not evidence of discrimination, particularly as the assertion lacks any evidence that the denial was triggered by race or was part of an environment of hostility directed at Thomas. Second, while Baldea's alleged comments are certainly hostile and discriminatory, there is little evidence to support that this event transpired in light of the fact that the incident was not mentioned in any previous filing, was not complained of at the time, and was not supported by any other testimony. In any event, this is but one incident of blatant discriminatory animus that cannot

provide grounds for a generally hostile workplace. Finally, the graffiti in question was certainly offensive, but Plaintiff makes no argument that Department staff committed this act, so it is applicable to the Department only insofar as its staff was negligent in addressing it. *Wyninger*, 361 F.3d at 976. According to Plaintiff's own account of the matter, however, the Department seems to have satisfied its duty to protect its workers with respect to this event, by keeping it discrete and quickly removing it.

It should be said that at a general level, the parties at the University Athletic Department were seemingly under a great amount of stress making the transition to the new facility and that, partly as a result of that stress, the involved parties often exchanged heated words or disagreed with each others' practices. Miller's job title, responsibilities, and resources were all changing, and at any such time mistakes will be made and some correct actions will be incorrectly perceived as mistakes. However, this general confusion and conflict does not amount to discriminatory hostility. *See Johnson v. City of Ft. Wayne*, 91 F.3d 922, 938 (7th Cir.1996) (plaintiff's claim that he was denied use of the company vehicle, excluded from the workplace during sick leave, denied vacation pay, and demoted does not create an objectively hostile work environment).

In the instant cases, there is simply not sufficient evidence on which a reasonable jury could find that the hostility rose to the level of being "severe or pervasive," or believe that it was "based on race." *Williams*, 361 F.3d at 1029. The few instances that Plaintiffs point to as hostile largely have nothing to do with African-Americans specifically or issues of race generally, and those remaining allegations that do involve these matters simply do not convey a workplace "permeated with discriminatory ridicule, intimidation, and insult." *Luckie v. Ameritech Corp.*,

389 F.3d 708, 713 (7th Cir. 2004). For these reasons, both Plaintiffs' hostile environment claims

fail. Defendant's motions are GRANTED.

**ANALYSIS OF MILLER'S FLSA CLAIM**[6]

The Fair Labor Standards Act generally requires that "[n]o employer shall employ any of

his employees...for a workweek longer than forty hours...unless such employee receives

compensation for his employment in excess of the hours above specified at a rate not less than

one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(2)(C).

FLSA does, however, provide employers with an exemption under which they can avoid the

overtime pay requirement if an employee works in an administrative, executive, or professional

capacity. 29 U.S.C. § 213(a)(1). In the case of the "administrative" exemption, this requires that

the employer establish that: (1) the employee is paid on a salary basis; (2) his primary duty

involves office or nonmanual work directly related to management policies or general business

operations; and (3) his work requires the exercise of discretion and independent judgment. 29

C.F.R. 514.215; *see also Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 533 (7th Cir. 1999)

(holding that these Secretary of Labor guidelines carry the force and effect of law via

congressional mandate).

That Miller was a salaried employee and thus meets the first prong of this exception is

not disputed. Therefore, the only remaining questions are whether Miller's primary duty

involved office or nonmanual work directly related to management policies or general business

operations, and whether he performed it with discretion and independent judgment. Miller

---

[6]Defendant maintains, and Plaintiff concedes, that Thomas was only included on the
FLSA claim due to scrivener error. Summary judgment is therefore GRANTED with respect to
this count.

himself attested to the fact that he had "game management responsibilities" requiring him to "make sure that all of the varsity competitions transpired," Miller Dep. at 125-126, which suggests that he had both managerial and discretionary responsibilities. However, he now denies that he had any real administrative authority, and maintains that his discretion was limited to simply implementing the directions of his supervisors. *Id.* at 125; Miller Resp. Summ. J. Mot. at 12-13. While there is some dispute as to the nature of his everyday work environment, the undisputed or conceded facts, along with Plaintiff's misrepresentations of the record, are nonetheless sufficient for deciding this issue as a matter of law. In light of the relevant factors and the record presented, this Court finds that Miller did indeed fall under the administrative exemption and that there was therefore no violation of FLSA.[7]

The record makes clear that others in the University considered Miller to be responsible for both the athletic aides who worked under him and the day-to-day requirements of those using the facilities. First, his job titles – "Assistant Director" and "Facility Manager" – both connote supervisory responsibilities. Second, the University's treatment of his position as a salaried individual and placement within organizational charts indicate that Defendant viewed him as having higher status than a manual worker. *See* Facts ¶ 24. Third, athletic coaches would come directly to him with their concerns about the facilities. Fourth, his supervisors, Weingartner and Coleman, both viewed him as the representative or overseer of the athletics aides, and gave him some freedom to do his job as best he saw fit. And finally, those who worked under him believed that Miller was their supervisor. *See, e.g.,* Thomas Dep. at 30-31 ("Q: Besides giving

---

[7]It is also likely that Plaintiff would have fallen under the similar "executive" exemption as well, but he need only qualify under one category to fall outside FLSA protections.

you your tasks for the day and opening and closing the gym and showing you how to do things, did [Miller] do any – what else did Curtis Miller do? A: Well he ran the office, you know, he – had a lot of paperwork and stuff like that he does.").  It is clear that Miller's position had the outward trappings of an administrator.

Miller attempts to counter this evidence, but fails.  The vast majority of Plaintiff's contentions regarding his work duties fly in the face of other witnesses or his own prior testimony, and are completely unsupported by the record.  *See, e.g.*, Pl.'s Facts ¶ 277 (attempting to explain away prior use of the term "direct supervisor" through unsupported assertions).  His own words make clear that he was responsible for overseeing other workers, worked as an administrator rather than a laborer, and possessed some degree of discretion.  *See, e.g.*, Miller Resumes,[8] Tab V, at 000972, 000975, 000978 (describing his duties as "direct[ing] the management and maintenance"); "Reasons for Salary Upgrade," Miller Dep. Ex. 43 ("I am responsible for the supervision of two full-time staff members and one part-time staff member"); repeated correspondence in which he and others refer to the aides as his "staff" or "crew"; and Complaint at 2 (referring to himself as Thomas's "immediate supervisor").  In addition, Miller's words are supported by actions, as the issues and events described in the record indicate that Miller exercised extensive administrative duties.  *See, e.g.,* Thomas Dep. at 31-32 (describing Miller's duties initialing time sheets); Pl.'s Resp. to Facts ¶ 276 (preparing athletic aide assignment checklists); Athletic Aide Overtime Proposal, Miller Dep. Ex. #15 (structuring

_____

[8]While it must be acknowledged that people often take liberties in describing their professional duties in a resume, those Miller reluctantly provided in discovery painted a consistent portrait of his work, and such evidence has been considered in other courts.  *See, e.g. Piscione*, 171 F.3d at 537.

worker hours); Thomas Dep. at 30-31 (purchasing equipment); and Facts ¶ 29-30 (contributing to the reviews of others and hiring/firing decisions). Whether or not these actions were done at the behest of his supervisors, this does not change the fact that these were Miller's primary duties in the workplace, all of which were executed out of an office that none of the athletic aides were given, at a level of pay not shared by those who worked beneath him, and through the use of significant, if not unfettered, discretion.

At the end of the day, even if this Court were to accept Miller's remaining arguments concerning his position and responsibilities in the department, these arguments are unconvincing. Plaintiff maintains that he did a "significant" amount of manual labor and maintains that others saw him performing these tasks, possibly even on a daily basis, in order to establish that this was his primary duty rather than administrative or executive tasks. Resp. Summ. J. Mot. at 12-13. However, this blatantly contradicts the record, his own words, and any logical conclusion that could be drawn from the evidence. Plaintiff has admitted that whenever he did such manual labor, he risked subjecting the university to a grievance because he was infringing on the SEIU-enforced responsibilities of the athletic aides that worked beneath him – it could hardly be inferred that his primary duty was one which placed his employer in perpetual danger of liability. In addition, Plaintiff has made no attempt to reconcile his argument here – that manual labor was his primary concern – with the fact that his hostile environment claim focuses a great deal of energy on the inadequacy of the size of his office. Despite discrepancies, Miller points to the possibility that he might have done such work on a daily basis as proof that it was his primary duty, *id.* at 13, neglecting the fact that one does not necessarily follow the other.

Plaintiff has provided inadequate evidence on which a reasonable juror could find a violation of FLSA.  Defendant's motion is GRANTED.

## Conclusion

For the foregoing reasons, Defendant's motions for summary judgment are GRANTED. All remaining motions are resolved.  This case is DISMISSED.

Enter:

/s/ David H. Coar
David H. Coar
United States District Judge

Dated: **January 29, 2006**